HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| NATHANIEL WASHINGTON, | CASE NO. C13-01556 RAJ |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| CITY OF SEATTLE; STEPHEN SMITH, JR; ALBERT ELLIOT; CLAYTON AGATE; and DOES 1-5, | |
| Defendants. | |

## I. INTRODUCTION

This is a civil rights action in which plaintiff, Nathanial Washington, alleges that Seattle police officers used excessive force in effecting his arrest. Dkt. # 30. Plaintiff has stated three claims in his Amended Complaint: (1) municipal liability, (2) excessive force under 42 U.S.C. § 1983, and (3) assault and battery under Washington State law. *Id.* The parties have filed cross-motions for summary judgment. Plaintiff seeks summary

judgment on the excessive force claim (Dkt. # 38) and defendants seek summary judgment on the municipal liability claim (Dkt. # 35).

For the reasons stated below, both motions are DENIED.

## II.   BACKGROUND

### a. Plaintiff's recollection of the arrest.

In the early morning hours of July 4, 2011, plaintiff drove his motorcycle along with friends to Club Habana Sodo in Seattle. ("Washington Dep.") Dkt. 36-1, p. 12. Plaintiff states that he ate dinner and drank about one half of an alcoholic drink at a restaurant before riding his motorcycle to the club. *Id.*, pp. 14, 18. At the club, plaintiff met up with his brother, Ricky Washington. *Id.*, pp. 20-22. Plaintiff asserts that he had one more alcoholic drink at the club. *Id.*, p. 27.

At approximately 1:15 a.m., plaintiff left Club Habana Sodo and walked outside. *Id.*, p. 31. There was a large, loud crowd of more than one hundred people congregating outside of the club. *Id.*, pp. 31-33. While outside the club, plaintiff became involved in a physical altercation with Dion Johnson, a hot dog vendor. *Id.*, p. 39. Prior to this altercation, plaintiff claims that he saw Johnson jump over his hot dog stand and chase plaintiff's brother, Ricky, into a crowd of people. *Id.*, pp. 39-40. Plaintiff testified that he does not know what started the conflict between Johnson and his brother, *id.*, p. 41, but claims that he saw Johnson chasing his brother with a knife. *Id.*, pp. 45-46. Plaintiff attempted to knock the knife out of Johnson's hand. *Id.*, pp. 45-46.

At some point, plaintiff saw his brother knock over Johnson's hot dog stand and witnessed it catch on fire. *Id.*, pp. 50-51. Plaintiff testified that he decided to leave on his motorcycle, and was in the process of putting his helmet on when his brother ran back towards him with Johnson following behind him. *Id.*, pp. 55-56. Plaintiff admits that he punched Johnson in the face and knocked him to the ground. *Id.*, p. 56.

Immediately after striking Johnson, plaintiff looked up and saw police officers approaching him with their weapons drawn. *Id.*, p. 67. One officer had a shotgun

pointed at him. *Id.*, 65-66. Plaintiff claims that the police officers handcuffed him "right there" and brought him to the ground. *Id.*, pp. 67-69. Plaintiff claims that he "surrendered" and did not resist arrest. *Id.*, p. 67. He contends that after he was brought to the ground, the officers unleashed a barrage of punches against his head and that one officer kneed him in the head. *Id.*, 71-72. Plaintiff then lost consciousness. *Id.* Because plaintiff lost consciousness, he does not remember what happened next. *Id.*, p. 74. He later testified that he did not see, feel, hear or notice being tased by any officer. *Id.*, p. 72. Plaintiff claims that when he regained consciousness, he was seated on the ground, leaning against a car. *Id.*, p. 72. Plaintiff was later taken to a hospital. *Id.*, p. 93.

### b.  Officer Agate

Officers Clayton Agate, Stephen Smith, Albert Elliot, and Jacob Briskey were involved in this incident.   Officer Agate was the first to approach plaintiff and to bring him down to the ground. (Agate Dep.) Dkt. #52-3, pp. 12-13. He claims that plaintiff was initially on his stomach, but began attempting to move on to his back. *Id.*, pp. 13-14. Officer Agate claims that he ordered plaintiff to remain on his stomach and not to move, but plaintiff did not comply with that order and continued to try and push himself up with his arms. *Id.* He again commanded plaintiff to stop, but plaintiff failed to comply with that order. *Id.* Officer Agate claims that he then pressed plaintiff's head to the ground and delivered one or two palm strikes to his body to gain compliance. *Id.*, p. 14.

### c.  Officer Smith

Officer Smith was with Officer Agate and observed at least some portion of the altercation between plaintiff and the hot dog vendor. (Smith Dep.) Dkt. # 52-1, pp. 14-17. When Officer Smith exited his police vehicle, he brought his shotgun with him. *Id.*, p. 19. Officer Smith claims that he did so because he felt the crowd was hostile, the officers had just been in a foot pursuit with someone with a firearm, he had seen numerous small fights break out, people in the crowd were yelling, and he saw numerous people throwing gang signs. *Id.*, p. 20. Officer Smith saw Officer Agate grab plaintiff by

the arm and assist him down towards the pavement. *Id.*, p. 22.  It appeared to Officer Smith that plaintiff "was sort of going down on his own." *Id.*  However, once plaintiff was on the ground, Officer Smith claims that plaintiff began to pull away from Officer Agate and turned to face him. *Id.*, p. 23.  Officer Smith then pressed his foot into plaintiff's back to keep him on the ground. *Id.*, pp. 23-24.

Officer Smith testified at his deposition that plaintiff did not make any attempt to flee the scene and did not make any threatening or hostile statements during the course of his arrest.  (Smith Dep.) Dkt. # 40-2, p. 21.

### d. Officer Elliot

When Officer Elliot arrived on the scene, he claims that he observed plaintiff struggling against police officers, swinging his arms and possibly kicking.  (Elliot Dep.) Dkt. # 52-4, pp. 17-18.  Officer Elliot attempted to apply his Taser to plaintiff. *Id.*, p. 13.  However, the Taser malfunctioned and the darts did not deploy properly. *Id.*  Officer Elliot attempted to apply his Taser again to plaintiff's back, this time in "drive-stun" mode. *Id.*, pp. 13-14.  Officer Elliot claims that the purpose of this application was to cause an amount of physical pain to gain compliance over the suspect. *Id.*, p. 16.  According to Officer Elliot, during this time, plaintiff continued to attempt to get off the ground. *Id.*, p. 19.  Officer Elliot further claims that his knees and back were injured during the struggle with plaintiff. *Id.*, p. 20.

### e. Officer Briskey

When Officer Briskey arrived on the scene, he claims that he saw plaintiff throwing punches at Officer Elliot.  (Briskey Dep.) Dkt. # 52-5, p. 31.  It appeared to Officer Briskey that Officer Elliot was moving around, looking for an opportunity to restrain plaintiff in handcuffs. *Id.*, p. 32.  Officer Briskey applied physical strikes to plaintiff's upper back, face and head areas. *Id.*, p. 33.  According to Officer Briskey, these strikes had no effect on plaintiff and he continued to actively attempt to escape/fight.  (Briskey Decl.) Dkt. 50, ¶ 4.  Officer Briskey claims that he then "may

have kneed him in the head or upper back area" and "[a]t some point, plaintiff went limp and stopped resisting briefly." *Id.* It was at this point, according to Officer Briskey, that plaintiff was placed in handcuffs. *Id.*

Officer Briskey later testified that the force he used on plaintiff was in accordance with his training. (Briskey Dep.) Dkt. # 40-4, p. 33.

### f. The Video

Part of this incident was captured on a smart phone video. Although the video confirms some of the facts recited above, a significant portion of the incident is obscured by a motorcycle.

## III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. For purposes of summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).

## IV. ANALYSIS

### a. Plaintiff's Motion for Summary Judgment on Excessive Force Claim

The Supreme Court teaches that in determining whether the force used to effect a particular seizure was excessive the court should pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* Reasonableness must also "be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* Additionally, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

Here, there are key differences in the parties' accounts. Plaintiff claims that he "surrendered" and voluntarily went down to the ground, at which point he was handcuffed. He then claims that he suffered a barrage of punches and was knocked unconscious. Indeed, although there is evidence that he was tased, he has no recollection of it.

The officers, by contrast, claim that plaintiff was fighting back and attempting to flee. They maintain that the level of force used was necessary to "gain compliance" in light of the circumstances, including the large, hostile crowd. They also insist that plaintiff was not handcuffed until the very end of the incident, after Officer Briskey delivered the blow that knocked plaintiff unconscious.

Despite these key factual disputes, plaintiff insists that summary judgment is still appropriate. (Reply) Dkt. # 57, p. 2. According to plaintiff, the court can rely upon the video footage to rule on summary judgment because it clearly depicts plaintiff's version of events. The court disagrees.

The Supreme Court addressed video footage in the context of excessive force cases in *Scott v. Harris*, 550 U.S. 372 (2007). *Scott* did not change the requirement that the court must draw all reasonable inferences in favor of the party opposing summary judgment. Rather, it simply made clear that the court is not required to draw inferences that are so "clearly contradicted" by video footage that no reasonable jury could accept them. *Id.* at 380-81. Here, although the video is certainly helpful, the picture is shaky and grainy, words are often difficult to decipher, and a significant portion of the arrest is partially obscured by a motorcycle. Because the video footage does not provide a sufficiently clear record of the events, the court must submit the excessive force question to the jury.

Accordingly, the court DENIES plaintiff's motion for summary judgment.

**b. Defendants' Motion for Summary Judgment on Municipal Liability**

The City seeks summary judgment on plaintiff's municipal liability claim. Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its employees on a theory of respondeat superior. *Monell v. New York City Dep't of Public Servs.*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is

responsible under § 1983." *Id.* at 694. A plaintiff seeking to establish municipal liability under section 1983 may do so in one of three ways: 1) the plaintiff may demonstrate that a municipal employee committed the alleged constitutional violation "pursuant to a formal governmental policy or longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" 2) the plaintiff may demonstrate that the individual who committed the constitutional violation was an official with "final policy-making authority and that the challenged action itself thus constituted an act of official government policy;" or 3) the plaintiff may demonstrate that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).

The Ninth Circuit has held that a municipal policy or custom "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001)). To be liable under *Monell*, however, this municipal policy or custom must be the "moving force" behind the constitutional violation. *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996). In other words, plaintiff must show that the municipal policy or custom *caused* the constitutional violation. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012).

The existence of a constitutional violation is a predicate to *Monell* liability. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Here, although fact questions remain as to whether a constitutional violation occurred, the City argues that even if it were to concede this point, summary judgment is nonetheless appropriate because plaintiff cannot establish any of the remaining *Monell* requirements. (Mot.) Dkt. # 35, p. 6. The court disagrees.

Plaintiff's primary argument under *Monell* is that the City's police department had a longstanding practice or custom of using unnecessary or excessive force. In support of this argument, plaintiff cites to the Department of Justice's ("DOJ") investigation of the Seattle Police Department ("SPD") and the DOJ's subsequent findings.[1] Indeed, the DOJ's report expressly acknowledges that the "SPD engages in a pattern or practice of using unnecessary or excessive force, in violation of the Fourth Amendment to the United States Constitution and Section 14141." DOJ Report, p. 3. The report goes on to explain that the DOJ based this legal conclusion on numerous factual findings, including:

Findings

> When SPD officers use force, they do so in an unconstitutional manner nearly 20% of the time. This finding (as well as the factual findings identified below) is not based on citizen reports or complaints. Rather, it is based on a review of a randomized, stratified, and statistically valid sample of SPD's own internal use of force reports completed by officers and supervisors.
>
> SPD officers escalate situations and use unnecessary or excessive force when arresting individuals for minor offenses.
>
> Multiple SPD officers at a time use unnecessary or excessive force together against a single subject. Of the excessive force incidents we identified, 61% of the cases involved more than one officer.

*Id.*, p. 4. The DOJ issued its report on December 16, 2011 -- five months after the incident involving plaintiff.[2] *Id.*, p. 1.

The City relies on *Lawson v. City of Seattle*, 2014 WL 1593350 (W.D. Wash. Apr. 21, 2014) and *Rengo v. City of Seattle*, 2014 WL 3579644 (W.D. Wash. July 21, 2014)

---

[1] The report is publicly available at: http://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf.

[2] The DOJ investigators reviewed use of force reports covering the period between January 1, 2009 and April 4, 2011. *Id.*, p. 4.

to argue that the court should discount the DOJ report and decline to consider it as evidence of a custom or practice of excessive force. (Mot.) Dkt. # 35, p. 7. Neither *Lawson* nor *Rengo* supports this position. In *Lawson*, Judge Theiler granted summary judgment on the municipal liability claim solely because the plaintiff in that case had failed to submit any evidence showing a *causal* link between the policies and customs identified in the report and the conduct of the officer. *See* 2014 WL 1593350, at * 14. ("Plaintiffs here, in light of the mere existence of the DOJ report and its findings and through the generalized and conclusory opinions in their expert report, fail to demonstrate the requisite causation between municipal policy and the conduct at issue in this case."). Similarly, in *Rengo*, Judge Zilly focused on the absence of any evidence demonstrating causation. *See* 2014 WL 3579644, at *2 ("Plaintiff provides no evidence that Officer DePina's alleged unlawful use of force occurred or was caused by the pattern identified in the DOJ report."). This court followed the same reasoning in *Caylor v. City of Seattle*, 2013 WL 1855739 (W.D. Wash. Apr. 30, 2013) and held that the plaintiff had failed to submit any evidence demonstrating a causal link. 2013 WL 1855739, at * 16 (referring to the DOJ report and finding that "there is no evidence that these policies caused Ofc. Schubeck to shoot Mr. Caylor.").[3]

Unlike *Lawson*, *Rengo* and *Caylor*, here, plaintiff has submitted sufficient evidence of causation to get to the jury. Officer Briskey delivered the blow that plaintiff alleges caused him to lose consciousness and necessitated his trip to the hospital. (Briskey Decl.) Dkt. # 50, ¶ 4. In his deposition, Officer Briskey admits that he "punched and elbowed Washington's upper back area, head, and face numerous times" and that he did so in accordance with his training. (Briskey Dep.) Dkt. # 40-4, p. 33. Additionally, the video reveals that multiple officers used force on plaintiff, and although the picture is not crystal clear, a jury could infer based upon the footage, the testimony of the officers

---

[3] *Cf.*, *Dunklin v. Mallinger*, 2013 WL 1501446, at * 24 n.8 (N.D. Cal. Apr. 10, 2013).

and other evidence, that the officers applied excessive force in concert against a single subject -- a problematic practice and custom identified by the DOJ in its report.[4] Further, the testimony of Sergeant Roger Rusness supports a causal link between the customs identified in the DOJ report and the conduct at issue here. (Russness Dep.) Dkt. # 48-5. Seargeant Rusness reviewed the use of force reports filed by the officers involved in this incident and concluded that the force used against plaintiff complied with SPD policy. *Id.*, p. 10. He then forwarded his conclusions up through the chain of command and a lieutenant and the Captain of Police signed off on his findings. *Id.*, p. 22. This evidence demonstrates that the officers' conduct was in line with the standard practices of the SPD and supports the inference of causation.[5]

Based upon the evidence before this court, it is certainly possible that the officers involved in this incident used the force described above because they feared the large/hostile crowd, because plaintiff refused to comply with their orders, and because he fought back and attempted to flee. However, the evidence also supports the inference that the officers used that level of force because of the SPD policies and customs described in the DOJ report. Thus, based upon the narrow circumstances of this specific

---

[4] In addition to Officer Briskey's testimony regarding the blows he administered to plaintiff's head, Officer Smith admits that he pressed his foot into plaintiff's back. Plaintiff has also presented evidence in the form of a Taser log (Dkt. # 40-5) and video footage that supports his theory that Officer Elliot applied four Taser strikes against plaintiff while Officer Briskey delivered physical blows. (Reply) Dkt. # 57, p. 5 (citing Taser log and video). Although this portion of the incident is partially obstructed by the motorcycle, based upon the totality of the evidence, a reasonable jury could accept plaintiff's theory that multiple officers simultaneously applied excessive force.

[5] Although Sergeant Rusness was not designated as a PMK witness by the City, his testimony is nevertheless admissible. Seargeant Russness cannot bind the City with respect to the exact terms of any SPD final department policy, *see, e.g.*, *Collins v. City of San Diego*, 841 F.2d 337, 341 (9th Cir. 1988), but he can testify regarding his personal knowledge of the use of force reports, the conclusions he reached and his knowledge regarding what happened next within the chain of command. This testimony is relevant to show a causal link between the policies and customs identified in the DOJ report and the conduct of the officers in this case.

case, the court finds that plaintiff has submitted sufficient evidence to present his *Monell* claim to the jury.

Accordingly, Defendants' motion for summary judgment is DENIED.

## V. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment on the excessive force claim (Dkt. # 38) is DENIED and defendants' motion for summary judgment on the municipal liability claim (Dkt. # 35) is DENIED. The court will set a new trial date and pretrial deadlines in a separate order.

Dated this 9th day of September, 2015.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge